## SMYTH vs. OLIVER.

31   39·
118  301

31   39
120  580

[BILL IN EQUITY BY WIFE, FOR REMOVAL OF HUSBAND FROM TRUSTEESHIP OF SEPARATE ESTATE, AND ESTABLISHMENT OF HER INTEREST IN CHOSE IN ACTION TRANSFERRED BY HIM.]

1. *Removal of husband from trusteeship of wife's separate estate.*—If the husband sell and transfer, without the assent of his wife, a promissory note which constitutes the bulk of her separate estate under the act of 1850, having been taken for the purchase-money of her property sold by them jointly; and afterwards abandon her, and leave the State,—this is sufficient cause for his removal from the trusteeship of her separate estate.

2. *Sale and transfer by husband of chose in action belonging to wife's separate estate.*— Under the "woman's law" of 1850, the husband has no right to sell and transfer, without the assent of the wife, a promissory note given for the purchase-money of her property sold by them jointly.

3. *Implied trust against purchaser of trust property.*—A purchaser from the husband, of a promissory note belonging to the wife's separate estate, with notice, express or implied, of the wife's equitable rights, will be held a trustee for her benefit.

4. *Implied notice to principal.*—Actual notice to an agent is implied notice to his principal.

5. *Mulatto incompetent witness against white person.*—The son of a mulatto is by statute (Code, § 2276) rendered an incompetent witness against a white person.

6. *Mode of impeaching witness.*—In a chancery cause, the testimony of a witness, whose general character for honesty is shown to be bad; who is also shown to have been the active agent of the party by whom he is examined, in a transaction with a trustee involving à breach of trust, of which he was at the time cognizant; being intimate with, and related to, said trustee; and testifying to facts which are in themselves strange and unnatural,— should be disregarded, except so far as it may corroborated by other testimony.

APPEAL from the Chancery Court of Butler.
Heard before the Hon. WADE KEYES.

THE bill in this case was filed by Mrs. Sarah Oliver, suing by her next friend, against her husband, Charles Oliver, Robert B. Smyth, and Thomas Frost. Its material allegations were these: That complainant intermarried with said Charles Oliver, in Butler county, Alabama, on the 9th of January, 1851; that she was possessed, at

the time of her marriage, of an undivided interest in several slaves and other personal property, which belonged to her in her own right; that on the 6th February, 1851, she and her husband sold her interest in said slaves and other property, to Thomas Frost, for $812 50, and took his two notes for the purchase-money, one for $750, and the other for $62 50, payable on the 1st January next thereafter; that both these notes were, by the advice and direction of her husband, made payable to "Charles and Sarah Oliver or bearer," were delivered to complainant, and by her deposited in the hands of her husband for safe-keeping; that her husband, on the same day, or very soon afterwards, transferred and delivered said notes, without her knowledge or assent, and without consideration, to said Robert B. Smyth, who was cognizant of the fact that they constituted a part of her separate estate, and that her husband had no right to dispose of them, and who has since instituted an action at law on them, in the name of Charles Oliver for his use; and that her husband immediately abandoned her, and left the State. The prayer of the bill was, that the complainant's husband might be removed from the trusteeship of her separate estate; that the action at law might be enjoined, and said Frost compelled by decree to pay to complainant the amount due on the notes; and the general prayer, for other and further relief, was added.

The defendant Smyth answered the bill; alleging that he had no definite knowledge, until after his purchase of the notes, of the consideration on which they were founded; that they were purchased for him by an agent, Williamson Harrison, who discounted them by taking 12½ per cent. off the face of them, and paid full value for them; insisting that, on the face of the notes, said Oliver had a right to transfer or sell them, and that he is entitled to protection as a *bona-fide* purchaser for valuable consideration; and demurring to the bill for want of equity.

Motions were made to suppress the depositions of Thomas Frost and Williamson Harrison, for causes which are stated in the opinion of the court; but the motions do not appear to have been acted on by the chancellor,

who, on final hearing, rendered a decree for the complainant, which is now assigned as error.

WATTS, JUDGE & JACKSON, for appellant.

J. F. JOHNSON, *contra*.

RICE, C. J.—The marriage of the complainant with Charles Oliver occurred in 1851, in this State, which was at that time their domicile; and therefore, their respective rights, interests and powers, in relation to any property owned by her at that time, or which accrued to her afterwards and before the adoption of the Code, must be determined with reference to the provisions of the act of the 13th February, 1850, entitled "an act to alter and amend an act securing to married women their separate estates, and for other purposes, approved March 1, 1848." Pamph. Acts of 1849-50, p. 63.

The first section of that act declares, "that no husband shall, by his marriage, acquire a right to the property which his wife had upon his marriage, or which she may after acquire by descent, gift, demise or otherwise, except as is hereinafter provided for; and that all such property "shall be taken, held and esteemed in law," as her separate estate. The second section provides, that all such property "shall be taken, esteemed and held as trust property, and, with the exceptions hereinafter provided, the same shall be subject to, and governed by, all the rules of law now governing trust estates." The third section declares, that all such property "shall vest in the husband, *as the trustee of the wife;* and the husband shall be authorized, so long as he may continue such trustee, under the provisions of this act, to have and possess, and to control and manage, all such separate estate, without liability to account to the wife, her heirs, executors, or assigns, for the rents, proceeds and profits thereof." The fifth section declares, that "such property, or any part thereof, may be sold by *the husband and wife,* and conveyed by *their joint deed;*" * * * "and the proceeds of every such sale shall be held and regarded as the separate estate of the wife, under the provisions of this act, and may be

4

reinvested by the husband in the purchase of other property, or be used by him in such way as may be deemed most beneficial for the interest of the *cestui que trust.*" By the sixth section, he is authorized to give a valid acquittance and discharge to any person who may pay over to him any money due to his wife, or to any person who may deliver to him any property coming to his wife. By the tenth section it is declared, that "the word property, as used in this act, shall be construed, whenever it occurs, to include all moneys, stocks, credits, *or other effects.*"

The notes in controversy in this suit were delivered to the complainant, after marriage, for personal property which belonged to her at her marriage, and which was sold by her with the assent of her husband. Her husband, having obtained possession of these notes, passed them, without endorsement or written assignment, to Williamson Harrison, the agent of the respondent Smyth, and, immediately thereafter, abandoned his wife, and left this State. Smyth asserts that, through his said agent, Harrison, he bought the notes of the husband at a discount of $12\frac{1}{2}$ per cent, paid the money to the husband, and that the notes therefore belong to him as a purchaser from the husband.

It is clear, that the notes constituted a part of the separate estate of the complainant, under the provisions of the act above cited; and the first question to be considered is, whether the husband had the right to sell them for money, without her concurrence or consent.

The great and leading object of the act above cited, was to "secure to married women their separate estates," not only against third persons, but against the husband himself. Its first section expressly renders the husband incapable of acquiring, by his marriage, any right to the property of the wife, except as is provided for in its subsequent sections. The fifth section authorizes the property, or any part of it, to be "*sold* by the husband *and wife,*" and the *proceeds* of every such sale to be *reinvested* by the husband in *the purchase of other property,*" or to be "*used* by him in such way as may be deemed most beneficial for the interest of the *cestui que trust.*" The provision as to a

*sale* of the property is obviously restrictive, and was doubtless intended to prohibit any *sale* of the wife's property, except such as might be made "by the husband *and wife.*"  The *reinvestment* by the husband, of *the proceeds* of every such *sale,* means something different from a mere *sale* of them.    They are to be reinvested "*in the purchase of other property*"—not *sold* for money.    So the privilege conferred on the husband, to *use* the proceeds of sale until reinvested, was not designed as an authority to him to *sell* them for money.    "Used" means "employed, occupied, treated."  The *proceeds* of a sale, made by *husband and wife,* of her property, *may be* by the husband alone reinvested in the purchase of other property ; but, if he does not so reinvest them, then they may be "employed, occupied or treated" by him, in any way which can fairly be deemed conservative of the "interest" of the wife *therein.*  His wife's *interest in these proceeds* is not to be destroyed by him, by *a sale,* or by any other act of his, except a reinvestment in the purchase of other property. Those proceeds may exist in the form of lands, slaves, horses, &c. ; for, on the sale by the husband and wife, they may receive in payment horses, slaves or lands. When the proceeds of such sale exist in that form, it is manifest that, to allow the husband alone to *sell* them, would defeat the great and leading object of the act above cited.    And when the proceeds of such sale exist in the form of promissory notes, we think a mere *sale* of them for money, by the husband alone, without the concurrence or consent of the wife, equally violative of the spirit of the act above cited.    To authorize him to *sell* the *proceeds* of such sale, in every form in which they may exist, would amount, in practice, to an authority to him to destroy the protection which the legislature plainly intended to secure to the wife, by that provision which makes it essential to the validity of a sale by her husband of her property, in the first instance, that she should join therein. To hold that he has such authority, is to hold that, as soon as the property is sold by him and his wife, the proceeds are at his mercy.    The statute does not provide or show that those proceeds were to be at his mercy ; but,

on the contrary, it clearly shows that they were to be and remain her separate estate, until reinvested by him in the purchase of other property; and that the property in which they might be reinvested would instantly become her separate estate. Our conclusion is, that the husband in the present case had no right or authority to sell the notes; that his sale of them was a breach of trust; and that he is unfit to conduct or manage her separate estate, or to be longer allowed to continue to be her trustee.

But it is contended, that Smyth ought to be protected, as a *bona-fide* purchaser of the notes from the husband, without notice. Is he such a purchaser? Upon the pleadings and credible and competent proof, we think he is not.—Kennedy v. Green, 3 My. & K. 719; Carr v. Hilton, 1 Curtis' R. 393. Notice to his agent in the transaction, was notice to him.—Downes v. Power, 2 Ball & Beatty's Ch. Rep. 491. Through his agent, he obtained the notes with notice that the right in equity belonged to the complainant, and connived at the husband's breach of trust. He has, therefore, no right to retain or collect them as against the complainant; but she is entitled to follow them into his hands, and to a decree that they be paid to her.—Lewin on Trusts, 205, 206, 610; Dunbar v. Tredennick, 2 Ball & Beatty's Ch. Rep. 304; Mead v. Lord Orrery, 3 Atk. 235; Le Neve v. Le Neve, *ib.* 646; Ambler, 436; McLeod v. Drummond, 17 Vesey, 163; Bonney v. Ridgard, 1 Cox's Ch. Cases, note 1.

In Smyth's answer, it is set up as a defense, that the complainant advised the sale of the notes by her husband, and assented to it after it was made. What the effect of such advice and assent by her would have been, if proved, we need not decide, because the proof does not convince us that she either advised or assented to the sale.

In deciding the foregoing questions, we have excluded from our consideration the deposition of Thomas Frost, a witness for complainant; because it appears that he is the son of a mulatto, and, therefore, incapable by statute to be a witness against a white man.—Code, § 2276.

We have also felt bound, by just and settled rules of law, to disregard the testimony of Williamson Harrison,

the agent of and a witness for Smyth, so far as it is in favor of Smyth and not corroborated; because of his active agency and participation in the transaction on which Smyth bases his claim to the notes, his relationship to and intimacy with the faithless husband of the complainant, the strange and unnatural occurrences stated by him as facts, and his bad general character.—1 Starkie on Ev. 455, *et seq*. It is true, the evidence does not prove that his general character for truth and veracity is bad; but the proof is, that his general character for honesty is bad. In Ward v. The State, 28 Ala. 53, we held, that in assailing the credit of a witness, the law does not restrict the inquiry to his general character for truth. One of the main grounds upon which the credit due to his testimony depends, is his *honesty*. To be faith-worthy, he must be *willing*, as well as able, to declare the truth; and although he may not have made any general character as to *truth*, yet his credit may be impeached by evidence that his general character for honesty is bad. Such a character is a fact, which cannot be wisely or safely excluded from consideration, in determining whether the witness be the witness of truth.

We cannot discover any error prejudicial to the appellant; and the decree is affirmed, at his costs.