[Evans v. English, and Pearson v. Evans.]

# Evans *v.* English *et als.*
# Pearson *v.* Evans *et al.*

*Bill in Equity to foreclose Mortgage.*

1. *Legal title to personalty taken by husband in payment of debts due the wife; in whom vests.*—The husband has authority to accept property in payment of debts due the statutory estate of the wife; and if he does so, intending the transaction for the wife's benefit, without taking title to himself, though without expressly taking title to the wife, the legal title to the property, if it be personal, of necessity vests in the wife, and the husband's mortgage can not divest it.

2. *Legal title to property acquired by husband's exchange of wife's property, where statutory mode of conveyance is not followed; in whom vests.*—Our statutes prescribe the only mode in which the statutory estate of the wife may be conveyed; and if the husband exchanges a portion of the wife's statutory estate for other property, the wife's property not having been conveyed in the statutory mode, the legal title to the property acquired by the exchange vests in the husband, and his mortagee, under circumstances constituting a *bona fide* purchaser for value, without notice, is entitled to protection against the wife's equities to the exchanged property.

3. *Lien for advances to make crop; to what extends.*—The statute as to advances to make crops, gives the advancer, who complies with its terms, a prior lien upon the crops, and stock bought with the money advanced to enable the party to make a crop; but it was not intended, and does not have the effect, of enabling the party, obtaining the advances, to give a lien displacing prior liens on property owned at and before the advances, and not procured with such advances.

4. *Same; what will not constitute.*—The statute will not give an instrument the privileges of the statutory lien for advances, unless its terms conform to the statutory requirements, and it is founded on the precise consideration expressed in the statute; an instrument securing not only advances, but debts founded on a different consideration, is not what the statute contemplates, and will not give the statutory lien, though if properly framed it may have effect as a mortgage.

5. *Landlord and tenant; what creates relation of.*—An agreement between two tenants in common, whereby one occupies and cultivates the joint estate, contracting to pay the other a stipulated rent for his portion, creates the relation of landlord and tenant between them, with its usual rights and incidents.

6. *Landlord's lien for advances; what necessary under act of March 8th, 1871.*—The statute of March 8th, 1871, (prior to its amendment, § 2467 of Code) giving the landlord a lien for advances, &c., required that the advances should be made by the landlord himself, and for the purpose of aiding in the cultivation of the rented lands for the current year; if the advances were not thus made, and for the specified purpose, the statutory lien did not attach as to such particular items—*e. g.*—as where the landlord forbore to collect his rent for a previous year, and re-rented for another year, under an agreement that the amount of back rent should be an advance for the current year.

APPEAL from Lowndes Chancery Court.

Heard before Hon. H. AUSTILL.

[Evans v. English, and Pearson v. Evans.]

The original bill in this cause was filed by Jane E. Evans, against C. J. English, Alice English, his wife, James M. Pearson, Levystein & Simon, and sought the foreclosure of a mortgage executed by C. J. English to her on the 13th of January, 1874, on certain horses and mules and other personal property, and the crops to be grown by him on a plantation known as the English-Pearson place, in Lowndes county. All the defendants answered. Mrs. English averred that the property mortgaged was her statutory separate estate, and the mortgage, as to her, was invalid. Pearson set up a claim for rent, of an undivided half interest in the premises, and for advances made by him to C. J. English; and Levystein & Simon made their answer a cross-bill and asked the foreclosure of a mortgage made to them by C. J. English on the 28th day of February, 1874.

The evidence discloses the following state of facts: On the 19th November, 1872, C. J. English borrowed of Mrs. Evans some money, and as security for this money, and some advances made to enable him to make a crop for the year 1873, he executed to her on that day his note for the sum of $2,279.25, payable January 1st, 1874, secured by a mortgage on the following property, to-wit: Nine mules named respectively Puss, Fanny, Pigeon, Lize, Lizzy, Frank, Rock, Crack and Mike, one four-horse and one two-horse wagon, one gin and press and all the farming implements then used on the plantatation then cultivated by C. J. English. This note was not paid at maturity, and on the 1st January, 1874, C. J. English sold the mules and other property embraced in said mortgage, and three other mules and two mares to Mrs. Evans, giving her a bill of sale therefor.

On the 13th day of January, 1874, Mrs. Evans resold the mules and other property mentioned in the bill of sale to C. J. English, and received in payment for them a mortgage executed by English, which covered the crop to be raised by him in 1874 on the Pearson-English place, and the following mules and horses: Puss, Fanny, Pigeon, Lize, Frank, Rock, Crack, Lucy, Mike, Lizzie, Manda, Sarah, Charley, Mary, Alice, certain cows, naming them, and the other personal property embraced in the first mortgage.

C. J. English and Alice, his wife, were married in 1869, and soon afterwards her husband received from her guardian eight thousand dollars in cash, and two thousand dollars in notes. Lewis C. Reese, the maker of one of these notes, turned over to the husband in payment four mules, named Mike, Bill, Pigeon and Sallie; two of which are embraced in

the mortgage, namely, Mike and Pigeon; one had died, and one had been exchanged for the bay mare Mary, mentioned in the mortgage. It was shown that the husband, with the money of the wife's statutory estate, had bought from a Kentucky drover seven mules, called Puss, Fanny, Lizzie, Rock, Crack, Frank and Lige, which were the mules embraced in the mortgage.

It was also shown that the place which was cultivated by C. J. English for the year 1874 belonged to his wife Alice, and Mrs. Pearson, wife of the defendant, James M. Pearson, as tenants in common, each owning one half, and that for several years English had rented Mrs. Pearson's portion of said land. Pearson testified that in 1873 he had rented his wife's portion of said land to English for the sum of $750; that in December of that year, English called on him and told him that his cotton crop was packed and subject to his claim of rent; and at the same time told him that the worms had cut his crop short, and that unless Pearson would assist him, he did not see how he could make a crop for the year 1874. At the same time English stated that while he regarded the rent of $750 as reasonable, for the reasons above stated, he could not pay that amount for the year 1874, and proposed that the rent for that year be placed at the sum of $375, and that Pearson allow him to keep the cotton he then had, and which was subject to Pearson's claim of rent, as an advancement for 1874, and make a further advance of three hundred dollars. Pearson assented to this arrangement, upon the express understanding that all was to be considered advances for 1874, and all of it should be used in making his crop in that year. Pearson testified that in pursuance of said agreement, he made the following advances to English: On the 30th day of December, 1873, $50; on the 7th day of January, 1874, check on Merchants' and Planters' Bank for $250; on the 9th day of February, 1874, Pearson gave English credit for supplies at the house of J. & B. Trimble to the amount of $23.25, and accepted his draft on Lehman, Durr & Co. for $100. Pearson also advanced $26.49 to English to pay taxes on the plantation.

On the 7th day of January, 1874, English executed and delivered to Pearson his note for the sum $1,568.49, which Pearson testifies was the amount of advances that year, eight per cent. interest thereon, and $375 rent for 1874, and did not include the credit given at Trimble's, or the bill of exchange on Lehman, Durr & Co. Pearson testified that in the latter part of November, or early in December, 1874, he

[Evans v. English, and Pearson v. Evans.]

had received from English nineteen bales of cotton, grown
on the Pearson-English plantation, in that year, and that he
had sold the same and applied the proceeds (some $1,205.73)
to the note of English, given as above stated.

Pearson further testified that he knew nothing of Mrs.
Evans' claim to the property, until a short time before he
received the cotton, when he was asked by her agent if he
intended to take the cotton, and upon announcing his inten-
tion to do so, was informed English " was owing Mrs. Evans
for advances on stock."

The claim of Levystein & Simon arose as follows: Eng-
lish, on the 28th day of February, 1874, being in need of
advances, excuted his note to Levystein & Simon for the sum
of $500, which declared " that said amount was obtained *bona
fide* as an advance, for the purpose of making a crop, and
without such advance it would not be in my [English's] power
to procure the necessary team, provisions and farming imple-
ments to make a crop." This note was included in a written
instrument or mortgage executed by English on the same
day to Levystein & Simon, which, after reciting the note
and the purpose for which it was given, bound him to deliver
to them for sale at stated commissions, his entire crop of
cotton, and in default of such delivery to pay commissions,
and the usual note of storage for one month in the city of
Montgomery, " as liquidated damages," &c., and concluded:
" Now, therefore, in order to secure the payment of said note
or writing, the delivery of said cotton for storage and sale,
and also to secure the payment of any further indebtedness
due and owing by me to the said Levystein & Simon, whether
for future advances, supplies of bagging, rope and ties, the
payment of bills and drafts accepted for my accommodation
or otherwise," I have granted, bargained and sold " the entire
crop of corn and cotton which may be made and grown during
the present year on the plantation in Lowndes county which
I am cultivating the present year," and the mules and horses
embraced in the mortgage given to Mrs. Evans in January,
1874. It was shown by the testimony of J. Simon that the
amount due Levystein & Simon on their mortgage, was six
hundred and eighty dollars, which amount they had advanced
to English in money and merchandise.

None of the witnesses testify as to the source from which
the mules Manda, Lucy and Sarah, or the horse Charley, or
the farming implements, wagons, gin and cotton press, de-
scribed in the mortgage to Mrs. Evans, were derived.

Mrs Evans' mortgage was duly recorded on the 17th day

of January, 1874, and Levystein & Simon's mortgage was recorded on the 27th day of March following.

The chancellor decreed: 1st, that the claim set up by Mrs. English to the stock and implements mortgaged to her by C. J. English and to Levystein & Simon was sustained, except as to the mule Manda; 2d, that J. M. Pearson has a lien for the rent due him for 1874, to-wit, for the sum of three hundred and seventy-five dollars; and a lien for the following sums advanced by him as landlord, to-wit, $300 in cash; $23.25 paid to the house of J. & B. Trimble, and $110.68 paid to Lehman, Durr & Co., which lien was superior to both the claims of Mrs. Evans and of Levystein & Simon on the crop, and that he had no further lein on the crop; 3d, that Levystein & Simon had a lien on the property embraced in their mortgage, which was superior to the lien of Mrs. Evans' mortgage.

A reference was ordered to ascertain the amount due to J. M. Pearson, Levystein & Simon and Mrs. Evans.

Mrs. Evans appeals and assigns: 1st. The decree declaring the mules embraced in her mortgage to be the property of Mrs. English.

2. The decree giving Levystein & Simon a priority over her.

3. The decree giving J. M. Pearson a prior lien for rents of 1874, and for advances made by him to English, over her mortgage.

Pearson also appeals, and by consent under the rules, assigns the failure to decree a prior lien on the crop in his favor, for the full amount advanced to English over all other liens, as error.

WATTS & SONS, for Mrs. Evans.—As against Mrs. Evans, none of the property can be said to belong to Mrs. English. Mrs. Evans had no notice of her claim, and parted with her money in ignorance of any claim by her to the property. Under the first mortgage, Mrs. Evans was a *bona fide* purchaser without notice, and for value.—*Morrow v. Wells*, 38 Ala. She was also a *bona fide* purchaser without notice under the bill of sale, dated January, 1874. The fact that the consideration for the property included in it, was a past due debt, makes no difference.—See *Saffold v. Wade*, 51 Ala. 213; *Shepherd v. Shaefer*, 45 Ala. 233; 51 Ala. 478; *Preston & Stetson v. McMillan*, 58 Ala.

Pearson had no contract of renting declaring a lien for advances. The statute requires such a contract to be prop-

erly recorded; and without such contract he had no lien, at least so far as the advances are concerned.

Levystein & Simon's mortgage bears date subsequent to Mrs. Evans, and the only theory upon which the decree, giving a priority over her, can be sustained, is that such priority is given by the statute. The statute gives a lien " on the *crop* and *stock bought* with the *money advanced*." It is not pretended that any of the stock embraced in the mortgage was purchased with money obtained from them. They certainly could have no claim, except on the crop, by virtue of any lien for advances. As a mere mortgage, it is clear that the right of Mrs. Evans is superior to theirs. The mortgage or lien of Levystein & Simon was for $500. The other advances were to be made in the future, and the statute gives no lien except for advances made *at* and *before* the execution of the written paper.

DAVID CLOPTON, and R. M. WILLIAMSON, for J. M. Pearson.

COX & HAUGHTON, for C. J. English.

Neither of the briefs for the other parties came into the Reporter's hands.

BRICKELL, C. J.—These are cross-appeals from a decree foreclosing a mortgage executed to the appellant, Jane E. Evans, by C. J. English, and adjusting conflicting claims and liens to the mortgaged property. The property consisted of mules, horses, cows, farming implements, a gin, cotton press, and the crops of cotton and corn grown by the mortgagor in 1874. It was all, except the crops, claimed by the wife of the mortgagor as her statutory separate estate, and the first inquiry is, whether any part of it, and what part, was her estate.

The husband and wife were married in 1869, and soon thereafter the husband received from the guardian of the wife eight thousand dollars in cash and two thousand dollars in notes. One of the notes was on Lewis C. Reese, from whom the husband as a payment received four mules, called, respectively, *Mike, Bill, Pigeon, Sallie.* Two of these mules are embraced in the mortgage, viz: Mike and Pigeon. One of the others had died, and the other had been exchanged for the bay mare *Mary,* embraced in the mortgage. The husband with the money of the wife purchased from a Kentucky drover seven mules, which seem to be those embraced

[Evans v. English, and Pearson v. Evans.]

in the mortgage, and called *Puss, Fanny, Lizzie, Rock, Crack, Frank, Lige.* The original mortgage was executed to secure a debt cotemporaneously created, was the consideration on which credit was given the mortgagor, and constitutes the mortgagee a purchaser for valuable consideration—protected against equities of which she had no notice.—*Wells v. Morrow,* 38 Ala. 125; *Fash v. Ravisies,* 32 Ala. 451; *Saffold v. Wade,* 51 Ala. 241. The subsequent sale to the mortgagee, the resale to the mortgagor, and the mortgage back by him, did not divest her of that character. The transaction was nothing more than a renewal of the debt, and of the security for its payment.—*Boyd v. Beck,* 29 Ala. 703. It is insisted for the mortgagee, that the only claim of the wife of the mortgagor to the mules, is an equity to charge them with the payment of her funds invested by the husband in their purchase, or to take them as her property instead of such funds, and that against such claim she is protected as a *bona fide* purchaser.

The proposition rests on the theory, that the husband by the purchase acquired the legal title. We can not admit this theory; on the contrary, it seems to us founded in a misconception of the power and duty of the husband under the statutes creating the wife's statutory estate. The power and duty of the husband is to receive the separate estate of the wife, whether it consists of money, choses in action, or other property, real or personal, and his receipt is a good discharge in law or equity to the person surrendering to him.—Code of 1876, § 2710. This power he exercises solely, and not jointly or concurrently with the wife. The property thus received vests in him as trustee, and he has *the right to manage and control the same.*—Code of 1876, § 2706. It is apparent that *the title* does not vest in the husband—that remains in the wife unaffected by the marriage, and unaffected by any act of the husband after marriage. The wife is enabled by the statutes to hold it as her separate estate. The possession vests in the husband, while the title remains in the wife. The possession vests in the husband as her trustee, that he may *manage and control* the estate, taking the rents and profits without liability to account. There can be no doubt that the husband had the power, and that it was his duty to collect the debts due the wife he had received from her guardian. The power was not a mere naked agency, coupled with no interest, and is not to be measured by the principles which would control such an agency. It is a power conferred on him as husband and as trustee, in the

exercise of which, he is of necessity clothed with a large discretion.   In the collection of debts if he deems it prudent, he can accept property in payment; and if he does not take title to himself, intending the transaction for the benefit, and as an investment for the wife, if the property is personal, from the nature of the transaction, the legal title to such property will as matter of law inure to her.   The title to personal property will pass by mere delivery of the property, without writing, and to whom it passes, often depends on the facts of the particular transaction, the consideration, and from whom it really moves.   It may pass to an undisclosed principal, or to an undisclosed *cestui que trust*, and whether it will, without ratification by them, the authority of the agent, or the power of the trustee who enters into the transaction, and does not expressly take title to himself, will determine.   The title of the wife to the debt on Reese paid by the purchase of the mules was legal, not equitable.   The mules were a mere substitute for the debt—accepting them in payment was a mere mode of collecting.   If money had been paid, the title of the wife to the money would have been a legal title.   Her title to the mules, the transaction being intended for her benefit, and as an investment for her, follows the character of her title to the debt.   The husband did not in accepting the mules as a payment of the debt exceed his power as trustee, and there is no circumstance indicative of an intention on his part to change the character of the wife's title, or to acquire title for himself.   Though it would be more prudent in such transactions that he should take written evidence of title to the wife, the property being personal, the title to which may pass by parol, the law does not compel him to do so to secure the title to the wife.   The case of *Bolling v. Mock*, 35 Ala. 727, depends on its own facts, and bears no resemblance to the present case.   In that case the husband having in his possession a promissory note the property of the wife, without her concurrence, transferred it in the purchase of property.   The transfer was an excess of his power as trustee, a breach of trust, and did not divest the wife of her legal title to the note.—*Smyth v. Oliver*, 31 Ala. 39.   Of consequence, the only claim of the wife to the property purchased, was equitable, growing out of the doctrine of implied or constructive trusts, which prevails only in a court of equity.   Here, the husband has not exceeded his power—has committed no breach of trust. The power of collecting the debt with which the statute clothes him has been exercised, and the mode of collection adopted, has been the acceptance in payment of person a

property, not taking title to himself, but leaving the title to follow the title to the debt paid. As the title to the debt was legal, vesting exclusively in the wife, we can not doubt her title to the mules was of the same character.

The statutes are silent as to the use or investment of moneys the separate estate of the wife, which the husband receives. It can not be supposed that it was contemplated these should remain in his possession unemployed, unproductive, a barren fund. Having the power to manage and control it, and the possession of it vesting in him as trustee, he may loan or invest it in property as he may deem best. *Marks v. Cowles,* 53 Ala. 499. When he invests in personal property, not taking title to himself, as matter of law the legal title inures to the wife.

The mortgage by the husband of these mules did not pass the legal title of the wife. It was an assumption of ownership and power by the husband, inconsistent with the trusts imposed by law, and had no more effect on the right and title of the wife than a disposition by a stranger.—*Patterson v. Flanagan,* 37 Ala. 513. We hold consequently the chancellor did not err in decreeing that the title of Mrs. English to the nine mules, called *Eliza, Puss, Fanny, Pigeon, Lizzie* or *Liz, Mike, Rock, Crack, Frank,* was paramount to and must prevail over the mortgage, or rather that as to these mules, the mortgage was void and inoperative. In this connection we will say, that we are not satisfied from the evidence that Mrs. English has any claim to the mules, *Lucy, Mandy, Sarah,* or to the sorrel horse *Charley,* or to the farming implements, wagons, gin, or cotton press, embraced in the mortgage. While it is very clearly shown from whom the mules were purchased, the amounts paid for them, and that these were assets of the wife's separate estate, the testimony is silent as to the acquisition of the other property. The chancellor therefore erred in decreeing that all this property was not subject to the mortgage.

The bay mare, *Mary,* seems to have been acquired by the husband by an exchange of one of the mules purchased from Reese. The only mode of conveying the wife's statutory estate, is by an instrument in writing executed by husband and wife jointly, and attested or acknowledged as the statute prescribes.—Code of 1876, §§ 2707–9; *Symth v. Oliver,* 31 Ala. 39; *Whitman v. Abernathy,* 33 Ala. 154; *Warfield v. Ravisies,* 38 Ala. 518; *Alexander v. Saulsbury,* 37 Ala. 385. The exchange of the mule for the mare was not made in this mode—was the unauthorized act of the husband and a breach

[Evans v. English, and Pearson v. Evans.]

of trust. Whatever were the rights of the wife to the mare, under the authority of *Bolling v. Mock, supra,* they were merely equitable, the legal title passing to the husband. The mortgagee standing as a *bona fide* purchaser without notice of the wife's equity is entitled to protection against it. The chancellor therefore erred in decreeing that Mrs. English had the superior claim to this mare. It may seem singular that the husband can use the moneys of the wife in purchasing property, to which the wife will acquire a legal title; or that he may accept personal property in satisfaction of a debt due her, and the title will inure to her; and yet he may not exchange the most insignificant article of personal property for another, (unless he pursues the mode of conveyance prescribed by the statute,) so that a legal title will pass to her. Such is the effect of the statutes, and their limitations on the power of the husband. Restraints on the power of disposition of the wife's fortune which the common law would give the husband, is a clear, controlling purpose of the statutes. The power he exercises in the collection of debts due the wife, or in the investment of her money, is conferred on him as trustee, and on him solely, and is not properly a power of alienation or disposition. The power of alienation or disposition is conferred on husband and wife, to be exercised by them jointly, in a particular mode, and excludes alienation in any other mode, or by the separate act of either.

The next question which arises, is as to the respective rights of the appellant, and of Levystein & Simon. The chancellor regarding Levystein & Simon as having a statutory lien for advances to make crops, decreed that though their lien was younger, it was superior to that of the appellants not only on the crops, but on the stock. As to the stock, the decree was clearly erroneous. The lien which the statute authorizes is on the crop, *and on the stock bought with money advanced to enable the party to make the crop. No lien is authorized by the statute, taking precedence of prior liens, on stock or property owned by the person obtaining the advances at or before the time they are made.* It is the crop, and the stock advanced, or purchased with the money advanced, on which, if it is declared as the statute directs, a lien having priority is fastened. The statute does not intend to disturb and displace prior liens on stock or farming tools, or implements, or any other property than the crop, which the debtor may own at the time of the advance. As to such property, the debtor is not armed with the power of nullifying and destroying prior liens he may have created. The words of

the statute are " the advance so made, or the amount thereof shall be a lien on such crop, and the stock bought or furnished with the money so advanced." It is just, and such are the words and spirit of the statute, that as the stock is acquired, or the money to purchase it, from the party making the advance, he shall have the prior lien on it. The debtor should not keep it without paying for it, and those dealing with him, have no just cause of complaint, that he is not able to transfer it so as to defeat him who advanced it, or furnished the money with which it was purchased. It would be unjust, and the statute does not warrant it, that as to the property already owned by the debtor, to the acquisition of which the party making the advance did not contribute, the debtor should confer on him a lien superior to that others had previously and fairly acquired. The only claim which Levystein & Simon can assert to the property other than the crop, is that of mortgagees. Their mortgage is junior and subordinate to that of the appellant.

Is their lien on the crop superior to that of the appellant? It can take precedence of the prior mortgage to appellant, only by virtue of the statute. The statute will not give it that operation, unless the terms of the instrument creating it conforms to the statutory requirements, and it is founded on the precise consideration expressed in the statute.—*Mc-Lester v. Somerville*, 54 Ala. 670; *Dawson v. Higgins*, 50 Ala. 49. It is not security for any other debt or contract, whatever may be its consideration, the statute contemplates. The instrument under which Levystein & Simon claim, does in terms conform to the statutory requirements, but its stipulations show that its consideration was not only advances made, but future advances contemplated, whether for the purpose of enabling English to make a crop, or for any other purpose, and to secure the payment of damages, if he should not keep his contract to deliver cotton to Levystein & Simon for storage and sale on commission. We can not regard such an instrument as creating the statutory lien. The statutory lien is capable of enforcement by attachment at law. If this instrument could be so enforced, for so much of the debt it secures as is really for advances, as to the remainder it could be enforced only by another suit at law or in equity. A multiplicity of suits would be encouraged; or it may be that the party splitting a cause of action, would recover for a part, and be barred of a recovery for the remainder. We have decided that as the effect of the statutory lien is to displace prior liens, created by mortgages or other instru-

ments, the statute must be strictly construed. A simple security, for a debt founded on the consideration of advances to enable a party to make a crop, the statute authorizes. Commingling other debts founded on other considerations, and a security for all, is not intended. Such security may be taken by mortgage or other appropriate instrument. But whatever may be the terms of the instrument, it is not the security the statute authorizes, and is not entitled to the statutory priority. The claim of priority on the crops asserted by Levystein & Simon, should not have been sustained. Their only right is as junior mortgagees.

A tenant in common occupying and cultivating the joint estate under an agreement to pay his cotenant a stipulated rent for his half, is liable for the rent in an action at law. *Lockard v. Lockard*, 16 Ala. 423. We can perceive no substantial reason for declaring that in such case, so long as the agreement continues, the relation of landlord and tenant does not exist, and that the one has not the lien of a landlord on the crop grown on the premises for the stipulated rent. The chancellor properly decreed Pearson had a landlord's lien on the crop for the agreed rent, prior in point of right to the mortgage to the appellant.

The statute of force giving a landlord a lien for advances to his tenant, when the advances were made by Pearson was the act of March 8th, 1871, (Pamph. Acts 1870–71, p. 19.) The lien declared was for " advances made, to assist or aid in the cultivation of said land for the current year." Whether the advances should be in money, team, farming implements, provisions, or labor, the statute does not declare. They must be made however by the landlord himself, and *to assist or aid in the cultivation of the land for the current year;* and consequently must be adapted to and intended for that purpose. It is a debt founded on this particular consideration, for which the statute creates a lien, and no arrangement between landlord and tenant can attach the lien to any other debt. They may agree that other debts contracted on other considerations shall be deemed advances, but they can not thereby entitle them to the statutory lien. It seems obvious to us, there is no part of Pearson's claim for advances which can be supported, unless it is for the three hundred dollars loaned. The debt for the rent of the land for the preceeding year could not be converted into an advance, though Pearson in consideration of English's promise that it should be deemed such, abstained from pursuing his statutory lien on the crops. The acceptance of English's draft in favor of

[Sprague v. Shields.]

Lehman, Durr & Co., and the credit given English with Trimble, created no other relation than that of principal and surety between them, and was not an advance within the meaning of the act of 1871. That act contemplated an advance directly by the landlord, and not by another on his credit. Since, the statute has been amended so as to embrace advances of this character.—Code of 1876, § 3467. The three hundred dollars loaned, was according to the evidence, an advance to assist in the cultivation of the crop, for which Pearson was entitled to the prior lien.

We have disposed of all the assignments of error, and on the appeal by the appellant Jane E. Evans, the decree is reversed and the cause remanded, that the chancellor may proceed to render a decree in conformity to this opinion. The appellees in that appeal must pay the costs thereof in this court and in the court of chancery. On the cross-appeal by James M. Pearson, the decree is affirmed, and he must pay the costs of appeal in this court and in the court of chancery.

STONE, J., not sitting.