MARY J. RIVES ET AL. *v.* NANNIE. K. NESMITH.

1. LANDLORD AND TENANT. *Purchase and assertion of adverse title by tenant. Effect of previous joint purchase. Case in judgment.*
   N. and R. purchased a defective title to a tract of land, knowing the defective character thereof, went into possession of the land, received a bond for title, paid a part of the purchase-money, and gave their two joint promissory notes for the balance. When the first note became due, R., being unable or unwilling to pay his part of the money due, entered into a written contract with N., by which it was agreed that N. should procure R.'s release from the notes and individually assume payment thereof, that R. should transfer or leave to N. all the rights secured by the bond for title, and that R. should retain possession of the land for two years, in order to reimburse himself for his part of the joint cash payment made on the land. N. accordingly procured the release of R. from the notes, and assumed payment of the same individually. While R. was in possession of the land under this agreement he purchased the outstanding valid title, and, after the expiration of the time during which he was allowed to retain possession, he moved off the land, and then instituted an action of ejectment therefor. *Held,* that after R.'s release from the notes, he held possession of the land simply as tenant of N., and had the right to acquire title and assert it, as he has done.

2. SAME. *When tenant may acquire and assert adverse title.*
   A tenant of land may, during his tenancy, acquire a title adverse to that of his landlord, and, after the expiration of his term and the surrender of possession, may recover upon it.

APPEAL from the Chancery Court of Claiborne County.

HON. LAUCH MCLAURIN, Chancellor.

The case is fully stated in the opinion of the court.

*E. S. Drake,* for the appellants.

The appellee's bill presents no equity.  She hasn't been deceived by Rives or harmed by him in any way.  He has surrendered possession of the land to her and put her in *statu quo.*  True, he bought the legal title while in possession under a contract with her.  But that contract was nothing more than a rescission of the Noble sale, coupled with a permission to remain in possession till January 1, 1885, which at most was but a two years' lease.  Nesmith recognizes it as a lease, and Rives delivered possession in accordance with that contract, as the bill alleges and all the evidence shows.  There is no element of estoppel.  For estoppel see Bigelow on Estoppel, 3d ed., 484; 50 Miss. 429; 55 Ib. 261, also 671, 748, 780; 56 Miss. 449, 454; 57 Miss. 638; 58 Ib. 30; 54 Ib. 121; 60 Ib. 429; 61 Ib. 299; 62 Ib. 209.

The well-settled doctrine that the tenant cannot dispute his landlord's title does not apply after the tenant has surrendered possession.  "The estoppel continues *till surrender of possession,*" Bigelow on Estoppel 390, near bottom (3d ed.), and again Bigelow says, 393, near bottom : "Two conditions are essential to the existence of the estoppel—1*st, possession ; 2d, permission."*  Here the possession ceased before ejectment was brought.  See, also, 2 Herman on Estoppel, §§ 871–2–3.  The cases in which this estoppel between landlord and tenant has been held were actions begun by the landlord to eject him from a possession received from the landlord, or suit for the recovery from the tenant for the use and occupation.  The rule was founded in a public policy ; the reason of the rule ceases when the tenant delivers possession, and, of course, the rule itself ceases.

The court below seems to have taken up an idea that Rives was a vendee of appellee.  There is absolutely no evidence that establishes, or tends to establish, such a conclusion.

*E. S. Drake* also made an oral argument.

*Stephen Thrasher,* on the same side.

There is no testimony, either inferentially or otherwise, going

to show that Rives " assigned " to complete the title-bond. He would have gladly carried out the contract if Noble could have made a good title, or had given a bond of indemnity to secure him harmless from the claims of the minor. A careful examination of the testimony will show that it was a rescission of the contract, and not an assignment of the bond.

It is not pretended, either in the bill or in the proofs, that at the time Rives purchased the land from the minor, Belle B. Reynaud, to wit, December 11, 1884, he was in possession under the title bond and as vendee of Noble, but the allegations in the bill and the proofs show that he was in possession as the tenant of the complainant, who alone sustained the relation of vendee to Noble. He was the tenant of the complainant, Nannie K. Nesmith, by virtue of the contract with her. She got the benefit of his five hundred dollar payment and the improvements, and in return he was to have the use of the place for two years. The relation of vendor and vendee between Noble and Rives had ceased, and this is the theory of both the bill and answer, and it is sustained by the proofs in the case.

Now it is true he purchased from the minor, Belle B. Reynaud, whilst he was in possession as the tenant of the complainant, but he did not offer to set up his title while in possession as such tenant. The bill does not pretend this—it says that he went out of possession and commenced his action of ejectment April 9, 1885, from the prosecution of which he is perpetually enjoined by the decree herein. Can a tenant purchase in an outstanding title, and assert it after the expiration of his lease or tenancy, and when he is out of possession? The authorities say that he can. This doctrine has obtained so far back as the case of *James* v. *Landon,* page 37 of Croke's Reports, during the reign of Queen Elizabeth. See 2 Herman on Estoppel, §§ 857 and 858 (here the text says that if the tenant purchases a better title than that of his lessor, he must surrender the possession to his lessor before he seeks to avail himself of his new title); *Child* v. *Chappel,* 9 N. Y. 246 ; *Jackson* v. *Rowland,* 6 Wendall 666 ; 2 Herman on Estoppel, §§ 844, 870, 871, and 872, and the long list of authorities in the support of the text.

*Stephen Thrasher* made an oral argument also.

*J. McC. Martin,* for the appellee.

It will be observed that the Chancellor uses the word " assigned " as characterizing the effect of the contract or agreement made between Orville and Nannie. No special form is necessary to make an assignment of a contract or bond. In equity it grows out of the character and nature of the transaction. Mr. Story lays down the rule, § 1047, thirteenth edition of Story's Equity Jurisprudence. " In order to constitute an assignment of a debt or other chose in action in equity no particular form is necessary. Indeed, any order, writing, or act which makes an appropriation of a fund amounts to an equitable assignment of that fund." See, also, *Field* v. *Weir et al.,* 28 Miss. 69.

The general principle upon which the decree is based is, that neither a tenant, vendee, or other person entering into possession of land under one whom he recognizes as his landlord or vendor, or with whom he contracts as having a recognized interest in the land, can acquire an outstanding title to the land so held without first restoring the parties to the full possession of the land, and then purchasing from the person having paramount title. " When a vendee enters land under a vendor, he cannot hold adversely to him nor dispute his title ; for one who enters under an executory contract to purchase is as much bound to be true and constant to the title of his vendor as he would be if he had entered in form as a tenant." *Fowler* v. *Cravens,* 3 J. J. Marshall 428, or 20 Am. Dec. 154; *Hardeman et al.* v. *Cowan,* 10 S. & M. 501 *et seq. ; Taylor et al.* v. *Eckford,* 11 S. & M. 34; *Champlin et al.* v. *Dotson,* 13 S. & M. 556 ; *Hill* v. *Samuel et al.,* 2 George 311.

" The purchaser from a stranger cannot affect the relation which had subsisted between the vendor and vendee or landlord and tenant. A vendee, having recovered his purchase-money from his vendor, is under every obligation of law and good faith to restore to him the possession of the land ; and, therefore, he could not defend himself, directly or indirectly, by gainsaying his vendor's title or pleading that of another. Before a vendee can claim under another person's title than his vendor's, he must prove either

that he had been evicted, or that, ascertaining his vendor had no title, he had abandoned the possession and notified the vendor that he had done so before he took a deed from another." "He cannot otherwise be protected by any other and adverse title." *Fowler* v. *Cravens, supra,* 155; also other cases cited above.

In the case of *Champlin et al.* v. *Dotson,* 13 S. & M. 556, the court says: "A purchaser of land under a contract of sale can do nothing to the prejudice of his vendor's rights so long as the relation continues; a vendor's right to immunity from acts to his prejudice by a purchaser in possession, does not depend on the vendor's having title to the land at the time of sale." "A vendee's extinguishment of an incumbrance or his buying in an outstanding title inures to the benefit of the vendor, and entitles the vendee to a proportionate abatement of the purchase-price." *Meadows* v. *Hopkins,* Meigs Tenn. Rep. 181; 33 Am. Dec. 141; *Crowell* v. *Craft,* 47 Miss. 60; *Aston* v. *Robinson,* 49 Miss. 353.

Appellant contends that the contract made with N. K. Nesmith stripped O. B. Rives of the character of vendee, and that, therefore, none of the above rules apply to him. Rives says that after he made the agreement with his co-vendee he remained in possession of the land as tenant. His agreement, as found by the court, shows in what character he remained in possession. Unquestionably, he had a two years' leasehold, but by his contract with his co-vendee he secured his release from further liability on the joint notes, and thereby imposed on her the whole responsibility of paying the same, with the understanding that Noble should make title to her when she finished paying said notes, and that at the end of the two years he would surrender the land to his co-vendee. Does not this estop him from asserting title against appellee? See Story's Equity Jurisprudence, thirteenth edition, §§ 395 and 397; *Shivers* v. *Simmons,* 54 Miss. 520, 522; *Staton* v. *Bryant,* 55 Miss. 261; and *Davis* v. *Bowmar,* 55 Miss. 671, 750. By the decree Rives is not injured. The court expressly provides that the money expended in the acquisition of Reynaud's title, with the interest on same, shall be paid to him, and it makes its payment a condition precedent to the conveyance of said lands to Nesmith.

*J. McC. Martin* also made an oral argument.

COOPER, C. J., delivered the opinion of the court.

The appellee exhibited her bill in the Chancery Court of Claiborne County to enjoin the prosecution of an action of ejectment, instituted against her by the defendant to recover certain lands, and to have him decreed trustee of the legal title for her.

The facts are found by the Chancellor to be: " That one Joseph Noble entered into possession of the lands in controversy under a bond for title executed by D. B. Sanford as 'tutor' for Isabella B. Sanford, a minor, residing in the State of Louisiana; that being so in possession, he contracted with Nannie K. Nesmith and Orville B. Rives to sell them the said lands for three thousand five hundred dollars, and to make a title upon payment in full of the purchase-money, which contract is evidenced by a bond for title; and the three thousand five hundred dollars was to be paid, one thousand two hundred dollars cash, and the balance in one and two payments, to wit, one thousand one hundred and fifty dollars on the first day of January, 1883, and one thousand one hundred and fifty dollars on the first day of January, 1884; that said Nannie K. Nesmith and Orville B. Rives assented to said contract, made said cash payment, executed their joint and several promissory notes for the said two deferred payments, received of Joseph and Sarah Noble their said bond for title, and went into possession of the land in controversy under said agreement and bond for title; that before the cash payment was made, or the execution of said notes and bond for title, the said Nannie K. and Orville had actual and constructive notice of said Joseph Noble's defective title to said land and knew that said Joseph Noble had no good and valid title to the same; that about the time the first of said promissory notes became due the said Rives entered into a written contract with his co-vendee, the said Nannie, whereby he assigned to her his interest in his, said Noble's, bond for title to them of said lands; said contract was as follows, to wit: said Rives was to remain in possession of the lands in controversy, and to have use of the gin and mill on the adjoining lands for the period of two years, beginning first

of January, 1883, to reimburse him for the sum of five hundred dollars paid by him to Joseph Noble (on the cash payment aforesaid on said lands), and for all improvements made by him on the lands in controversy; that said Nannie was to assume the payment of both of said notes and to release the said Orville from any liability on same; that said Orville was at the expiration of said two years to surrender possession to said Nannie, and that said Noble was to make title to said Nannie alone whenever she complied with the conditions of the said bond for title; that under the contract last aforementioned, the said Nannie procured the release of the said Orville from any further liability on said two notes, and also assumed the payment of same; that while still in possession of said lands, never having been out of possession from the time he entered as co-vendee with said Nannie, said Rives, on the eleventh day of December, 1884, without the knowledge or consent of either the said Nannie or the said Joseph and Sarah Noble, purchased the outstanding title to the lands in controversy from Belle B. Reynaud, being said minor Belle B. Sanford, and afterward still remained in possession of said lands until after the first of January, 1885, when e moved out of possession after the institution of eviction proceedigs against him; that on the ninth day of April, 1885, under the same title acquired by him as aforesaid from Belle B. Reynaud, he commenced an action of ejectment against said Nannie."

On the facts so found the Chancellor decreed that Rives held the title to the lands as trustee for the complainant, and directed an account to be taken, showing the price paid by him to Mrs. Reynaud for the title acquired by him, for which sum he decreed a lien in his favor on the lands; upon the payment of the sum so found due he directed that Rives should convey the legal title to the said Nannie, and perpetuated the injunction against the prosecution of the action of ejectment. From this decree the heirs-at-law of Rives (he having died since its rendition) appeal.

The written contract referred to in the Chancellor's findings of facts as having been made between Mrs. Nesmith and Rives has been lost, and its contents were established by parol.

C. R. Nesmith, a mutual friend of the parties and the person by

whom the written contract was reduced to writing, gives this history of the circumstances under which it was made and states the contents of the writing: " There was some altercation between Rives and Nesmith (the husband of complainant) about its payment (the payment of the first maturing note given for the purchase of the land from Noble). Rives sent a buggy for me to go up to his mother's. I went up, and there found them discussing the matter. Knowing that Rives had no money and that Mrs. Nesmith could not return the money to him that he had paid on the place, I suggested that Rives have the use of the place for two years, which I thought would reimburse him for his payment and the improvements he had made. This was agreed to and I put the agreement in writing. The agreement was that Rives, for the five hundred dollars cash payment he had made and for the improvements he had made, should have the place for two years and the use of the gin and mill on the adjoining place free of rent, and that Mrs. Nesmith should pay the joint notes as they fell due and was to receive the title from Noble. I reduced this agreement to writing." There seems to have been but little controversy between the parties as to the contents of the written contract, except that complainant asserted it contained the stipulation that she should assume payment of the unpaid purchase-money, while defendant denies that anything was said, either in the oral negotiations or in the contract on that subject. The parties are at issue also upon the reasons for which the defendant withdrew from the purchase. He avers that upon learning the character of Noble's title and that a minor was the holder of the real title, he declined to make further payment unless indemnified, and that Noble declining to execute a satisfactory bond of indemnity, he refused to pay the purchase-money or to quit the possession of the property unless repayment should be made of the sum he had paid. The complainant states that defendant knew at the time of the purchase the exact character of the claim Noble had to the land, and that his reason for retiring from the purchase was that he was unable to pay the balance due. This is, we think, wholly immaterial. The question is, what was done, and not why it was done. The

whole testimony makes it reasonably certain that what was agreed
on was that the defendant, having from some reason determined
not to complete the purchase, was by the consent of Mrs. Nesmith
and Mr. Noble released from his obligation on the notes and was to
take nothing under the bond for title.   He was to withdraw from
the trade, and Mrs. Nesmith was to pay the unpaid purchase-
money and have title conveyed to her by Noble as though the bond
had been originally made to her alone ; that Rives was to have
the use of the property for two years (and the use of the gin and
mill on Mrs. Nesmith's adjoining place) in lieu of a return to him
of the purchase-money he had paid and of compensation for im-
provements he had put upon the land.   The written contract, as
established, is not at all contradicted by proof of these facts, and
they are, we think, indisputably established by all the testimony in
the case.   The statement by the Chancellor in his findings of fact
that the defendant " assigned "· the bond for title to the complainant
means, as we construe it, no more than that she was to have the
title thereby secured to be conveyed from Noble.   As matter of
fact the bond appears in the record and there is no assignment
thereon.   Under the contract between Mrs. Nesmith and Rives
Noble permitted Rives' name to be erased from the notes, and
thereafter Mrs. Nesmith was the recognized obligee in the bond
and Rives was her tenant.   It would probably be immaterial
whether Rives was the assignor of his interest in the bond to Mrs.
Nesmith or merely withdrew from the purchase, but, however this
may be, it is, we think, established by the evidence that he simply
declined to complete the purchase and was by the assent of all
parties allowed to withdraw.

After this written contract was made and Rives' name erased
from the notes, he held possession of the land simply as tenant of
Mrs. Nesmith.   There was no relationship of trust or confidence
between himself and Noble.   He owed him no duty either as
vendor or landlord, and might lawfully acquire the real title from
the real owner.

So long as the relationship of landlord and tenant existed be-
tween Rives and Mrs. Nesmith he could not deny her title to the

premises in an action brought by her to recover either the possession of the property he had agreed to surrender or to enforce any obligation due from him as tenant to her as landlord. But it is not true that a tenant may not acquire an adverse title to that of his landlord during the tenancy, and after the expiration of his term and the surrender of possession recover upon it. 1 Wash. on Real Prop. 490 ; Tiedman on Real Prop. 199.

On the facts found by the Chancellor we are of opinion that the law is with the appellants, and that the injunction should have been dissolved and bill dismissed.

*The decree will be reversed, the injunction dissolved and bill dismissed, and cause remanded to the court below to inquire of the damages that should be awarded on the injunction bond.*