# CHARLESTON.

CORNELIA M. DRAKE *et al.* v. ANNA M. O'BRIEN, ADMX. *et al.*

Submitted March 12, 1919.   Decided March 25, 1919.

1. APPEAL AND ERROR—*Orders Appealable—Decree.*

    A decree on a bill filed by plaintiffs who, *prima facie,* are tenants in common with some of the defendants, charging deeds from those under whom they claim to persons under whom such defendants claim, purporting to be absolute conveyances of undivided interests, to have been in fact mortgages, and seeking redemption or reconveyances and an accounting for rents and profits, which adjudicates the conveyances to have been absolute, sustains demurrers to the bill, without dismissal, and grants leave to show grounds for an accounting, by amendment of the bill, is not appealable, because it does not settle all of the principles of the cause.   (p. 682)..

2. MORTGAGES—*Deed as Mortgage—Bill—Laches.*

    A bill to have a deed absolute on its face adjudged to be in fact a mortgage, filed by descendants and successors of the grantors, more than thirty years after payment of the alleged mortgage debt and after the deaths of all the parties thereto, the plaintiffs and their ancestors having been out of possession of the property during all of such period and silent as to the character of the deed, and the question of its true character being dependent largely upon oral evidence, is barred by laches. ' (p. 683).

3. TENANCY IN COMMON—*Power to Lease.*

    A tenant in common of oil producing property, having authority from his cotenant to lease it for oil production, without limitation except as to the amount of the royalties to be reserved, conferred upon him by the deed of his cotenant, conveying to him his interest in the land, may make a valid parol lease thereof for such purpose, within the limitations prescribed by law.   (p. 685).

4. SAME—*Parol Lease—Presumption.*

    One who has been in possession of the property under such authority and conducting operations thereon for many years and accounting for the royalties to the owners, is presumed, in the absence of evidence of a lease by deed, to be a parol lessee, or such status is legally inferable from the facts and circumstances. (p. 685).

5. LANDLORD AND TENANT—*Parol Lease—Tenancy from Year to Year.*

    Though such a lease is not valid as one for a term of more than
    83 W. Va.

five years, by reason of the inhibition of the statute of frauds, it together with possession thereunder and payment of the royalties, for many years, creates at least a valid tenancy from year to year, terminable, if at all, only by statutory notice and barring any relief by injunction and receivership, until extinguished in some way. (p. 688).

6. JUDGMENT—*Conformity to Prayer.*

Though the pleadings and evidence in a cause having for its purposes those above indicated may show grounds for partition of the land, in some way or to some extent, or a sale thereof in lieu of partition in kind, it is not error to fail to award it by a decree settling the principles of the cause, in the absence of a specific prayer therefor, nor does such failure deny right of appeal from the decree. (p. 688).

Appeal from Circuit Court, Wood County.

Action by Cornelia M. Drake and others against Anna M. O'Brien, administratrix, etc., and others, and P. D. Neal, executor, etc. Decree for plaintiffs and certain defendants appeal.

*Reversed in part. Affirmed in part. Remanded.*

*W. H. Wolfe* and *V. B. Archer,* for appellants.

*Wm. Beard* and *W. E. Sikes,* for appellees Drake and others.

*Reese Blizzard,* for appellee Neal.

POFFENBARGER, JUDGE:

This appeal seeks review of three decrees entered, respectively, March 19, 1914, April 6, 1917, and March 28, 1918. The last one awarding the plaintiffs a right of accounting for oil, coal and timber taken from a tract of land containing about 1,000 acres, throughout a period of more than thirty years, upon a basis determined by it, as well as partially by the preceding decrees, may be deemed to have settled the principles of the cause. Whether the first one did is questioned by a cross-assignment of error.

The primary claim of a right to an accounting depends upon the legal effect of two deeds dated, respectively, June 26, 1875, and April 4, 1877, and purporting to convey undivided interests in said tract, both of which the plaintiffs charge in their bill to have been mortgages. This conten-

tion, as well as the claim to a right to an accounting upon the facts alleged, was rejected by said first decree; but the court, being of the opinion that the plaintiffs might be able to show themselves to be entitled to an accounting, granted them leave to amend their bill. Both plaintiffs and defendants complain of that decree, the former, because it held the deeds to be absolute, and the latter, because it did not preserve their alleged right to operate the entire tract of land for coal, oil, gas and timber, under the terms of the deeds purporting to confer such rights.

The deed of June 26, 1875, executed by Edmund L. Gale and Mary Gale, his wife, to James M. Stephenson, Thompson Leach, W. Vrooman, C. H. Shattuck and H. H. Moss, after reciting the existence of a deed of trust on the lands in question, to secure the payment of ten $5,000.00 notes held by William Cady, payment of four of them, default as to one and partial default as to another, making past-due indebtedness of $8,146.56, conveyed to the parties of the second part an undivided one-half interest in and to at least one thousand acres of a tract containing about 2,000 acres, situated in Wood and Ritchie Counties, for and in consideration of said sum of $8,146.56 and covenants therein contained, authorizing the grantees to take immediate and exclusive control of said 1,000 acres and all personal property thereon and operate the same as to them should seem best; to collect all rents and profits then due or thereafter to become due to the parties of the first part; to cut timber from said land or mine for coal, oil, salt or other mineral products; all to the end that the grantees might make as much money as possible out of the land and pay out of the rents and profits, (1) all necessary expenses of operation; (2) themselves the $8,146.56 paid by them to Cady; and (3) the remaining notes held by Cady. They bound themselves to pay the Cady debt out of the rents and profits, if sufficient, but not otherwise. But their right to operate the entire tract was not to terminate with reimbursement for their out-lay and payment of the Cady debt. It was to continue indefinitely and the net proceeds or profits of operation were to be divided equally between them and the grantors. The deed expressly

provided that they should continue to have the entire and exclusive control of the entire 1,000 acres, and to work and manage it for any purpose and in any manner they should see fit; and gave them sole and exclusive right to grant leases on the land for mining coal, oil and other minerals, or for cutting timber; provided that no leases should be granted for a royalty less than one-fourth of the production, nor any existing royalties reduced below one-fourth without the consent of the grantors. Gale was then the owner of oil wells on the tract and he was required to pay a one-fourth royalty out of the production of his wells.

By the deed of April 4, 1877, the same grantors conveyed to the same grantees an additional undivided one-eighth of the same tract of land, for and in consideration of $5,000.00, and a re-affirmation of the grant made to them by the former deed and all of the covenants and provisions thereof. This deed expressly stipulated that, after full payment of the Cady debt, the grantees were to account to the grantors for only three-eights of the net income from the property. By a deed dated, Sept. 24, 1877, the Gales conveyed to George Loomis an undivided one-thirty-second of the tract, in consideration of the sum of $1,250.00. This deed recited the two former deeds and stipulated that Loomis should hold the interest conveyed to him in the same manner to all intents and purposes, as the grantees in said deeds held theirs.

The grantees in the first two deeds, holding twenty-thirty-seconds of the land and operating it for oil, conducted the business under the name and style of the Wood County Petroleum Company. The Cady debt was paid off and his deed of trust released, Dec. 12, 1877, and thereafter, the Wood County Petroleum Company received from the operations one-fourth of the gross production from the oil wells and paid to the Gales and others their *pro rata* shares of such one-fourth, as and for their shares of the net profits. Mary Gale, the original owner of the tract, died many years ago. She, until her death, and those deriving their interests from her, after her death, accepted the payments so made, without objection or complaint, until a comparatively short time before the institution of this suit in 1913. The uniform prac-

tice of the Wood County Petroleum Company was to make a distribution of the royalties received, when and as often as they amounted to $1,200.00 or more. When the land was taken over by it, the operations were conducted by strangers to the deeds, under leases yielding one-fourth royalties, except in the case of the Gale wells which paid an equivalent share of the production, under provisions of the deeds. But the manner of conducting the business underwent a change about the year 1890, when Shattuck sold and conveyed his interest to one Dennis O'Brien who had, since 1885, acted as the agent of the Wood County Petroleum Company, in charge of the property. At or before that time, some of the leases had been abandoned and O'Brien took charge of the wells on them and operated them himself, without having taken leases on the territory. He paid one-fourth of the production to the Wood County Petroleum Company of which he was a member. Gradually other leases were abandoned by their owners or bought out by him, and he finally became the sole operator on the greater part of the land. In the mean time, he purchased, at different dates, the interests of Leach, Vrooman and Moss, and also additional interests from the Gales, but not all of them. He died in 1910, since which date, his widow, Anna M. O'Brien, as administratrix with his will annexed, has continued the operations upon the land. The Loomis and Stephenson interests were not acquired by O'Brien and he carried on the work with the assent of the representatives of the estates of Loomis and Stephenson, paying them, as well as the owners of the unacquired Gale interests, their shares of the one-fourth of the production, through the Wood County Petroleum Company.

The decree of March 19, 1914, sustaining demurrers of the executors of the wills of Shattuck, Vrooman and Moss and dismissing the bill as to them, and sustaining the demurrers of the administrators of the estates of Loomis and Stephenson and the O'Briens, without dismissal as to them and with leave to them to amend, was not appealable, except possibly as against the parties as to whom the bill was dismissed, although it held the deeds of 1875 and 1877 to be absolute conveyances of undivided interests in the land and not mort-

ga es, for it did not settle all of the principles of the cause, as between the remaining parties. It neither awarded nor denied the alleged right to an accounting. Being of the opin on that the allegations of the bill were insufficient to disclose such right, but that it might be shown by some additional allegations, the court withheld its final determina- tion of that issue by its grant of leave to amend. The con- struction of the deeds incorporated in the decree was a mere incident of the disposition of the demurrers, which might have been omitted from it. In other words, the statements of the court's opinion on that question, although requested by the parties, was, in legal effect, no more than a provisional adjudication or a recital of a finding of law constituting part of the reason for sustaining the demurrers. However this may be, the decree did not settle the principles of the cause. within the meaning of the statute, because it did not determine all of the principal issues raised. *Hill* v. *Cronin*, 56 W. Va. 174; *Shirey* v. *Musgrave*, 29 W. Va. 131; *Wood* v. *Harmison*, 41 W. Va. 376.

On the issue as to whether the deeds were in fact mort- gages of the undivided interests they conveyed in absolute terms, the principle of laches clearly applies. For thirty- six years after payment of the alleged debt, the grantors and those claiming under them acquiesced in the claim of absolute title which the deeds purport to pass. If it had not been paid, it would have constituted an obstacle to the assertion of a demand for reconveyance, for a mortgagor is not always able to redeem and yet he might be benefitted by a foreclosure sale, since the property might sell for more than the debt. This circumstance might excuse long delay, for courts of equity are tender and indulgent to the unfortunate and help- less. Here, however, there was no such obstacle. If the con- tention of the appellees as to the character of the instruments and the relations of the parties, at the inception of the trans- action, is correct, a reconveyance without the payment of a dollar, could have been enforced at any time within thirty years preceding the date of the institution of this suit. For about eight years after the alleged right of reconveyances ac- crued, Mary Gale lived, received her payments under the

terms of the deeds, and then died, without having demanded it. Two of the plaintiffs also acquiesced from 1885 until 1913, or shortly before the latter date. The others are grand children of Mary and Edmund L. Gale, the grantors. All of the grantees in the deeds are dead, some of them having passed away many years ago. If the true understanding and agreement is not shown by the deeds, it must be established, to a very considerable extent, by oral evidence, and the voices of all of the immediate parties to it have been closed by death. The maxim once a mortgage, always a mortgage, may be inflexible and without limitation, but the establishment of the relation of mortgagor and mortgagee is an entirely different thing from the consequences thereof after it has been established. As to that, parties cannot be allowed to sleep on their rights forever. A deed absolute on its face creates a *prima facie* status which must endure, unless and until it has been overthrown in a permissible manner. In the absence of an impediment or obstacle to the assertion of the claim of right to alter that status, excusing unreasonable delay in the assertion thereof, laches ought to apply as readily and forcefully here as in any other case of clear lack of reasonable diligence, and it does. *Hill* v. *Saunders,* 115 Va. 60; *Baird* v. *Baird,* 48 Col. 506; *Godden* v. *Kimmell,* 99 U. S. 210; Jones, Mort. sec. 109a. This is not the ordinary case of a mortgagor remaining in possession and struggling along under a debt he cannot pay. Time may not run against him, on account of his possession, and there may be no limit upon his right to assert the true relation obscured by a deed absolute on its face. But these plaintiffs have not been in actual possession and the alleged debt has been paid beyond the span of a full generation. They and their ancestors have consequently maintained the status accorded them by the deeds they assail after this long period of wholly unqualified acquiescence. The award of an accounting stands upon the theory of lack of right in the grantees in the deeds, to abandon the leasing of the lands, yielding them only incomes from royalties, and adopt the plan of direct and actual mining at their own expense and in their own way, without liability to the plaintiffs for *pro rata* shares of the full net income from such

mining, which is alleged to have been much greater in value
than one-fourth of the production from the wells.    The
charge is that, instead of confining themselves to the royalty
income fixed by the deed at not less than one-fourth, to be
divided among the interested parties, the grantees have taken
unto themselves what is termed the working interest in the
lands and wrongfully retained the profits arising from that
interest.   The period to be covered by the accounting begins
July 15, 1890, the date of O'Brien's purchase of Shattuck's
interest, and the Loomis, Stephenson and O'Brien estates are
charged on the basis above indicated.   O'Brien, it will be
remembered, was not a party to the deeds.   There was no
agency or trust reposed in him by the grantors.   He acquired
his interests by purchase from Shattuck, Vrooman, Leach
and Moss, four of the grantees, and some of the Gale heirs
and devisees.   He began his operations in July, 1890, after
his purchase of Shattuck's one-eighth and continued them,
with the assent of Vrooman, Leach and Moss, under this
status of the title, until July 15, 1897, when he acquired the
interest of Leach.   On Nov. 3, 1898, he acquired the interest
of Moss, and, on Nov. 27, 1901, that of Vrooman.   Stephen-
son's interest was not obtained.   He died long before O'Brien
became interested in the property, but his estate has retained
such right and title as the deeds conveyed to him and has
shared in the royalties accounted for and still does so.

O'Brien's operations on the property began while three
of the grantees were still living and retaining the rights
vested in them by the deeds, including right and power to
manage, control and lease the entire tract, the interests they
did not own as well as those they owned.   As to the interests
not owned by them, the deeds created at least a power of at-
torney or an agency.   Even though the agency so created
may have been revocable, it had not been revoked at the
date of the admission of O'Brien to possession of the prop-
erty and the commencement of his operations thereon for
oil.   He may have had no deed of lease, requisite to the crea-
tion of an estate for a term of years, and there is no proof
that he did, but the authority of Vrooman, Leach and Moss
to lease the property for mining purposes is clear beyond

doubt, and their authority to do so was not limited by any restrictions as to the character of the leases they should make except in respect to the royalties to be reserved. The facts and circumstances disclosed abundantly justify · the inference that they made at least a parol lease of the property to O'Brien. They let him into the possession of the property and accepted a one-fourth royalty from the oil, as if they had leased the property to him on that basis. One of them recognized and treated him as a tenant, for seven years, another for eight and the third for eleven. And the circumstances manifestly preclude the 'theory of a mere tenancy at will. No person could afford to drill and equip oil wells for their use merely at the will of the owner of the land. It is costly and hazardous work, and it is matter of common knowledge that leases for such purposes are generally, if not invariably, made to continue so long as oil shall be produced from the land after discovery. Such a lease, though technically one for an indefinite period, always runs beyond a year or any other short term. The nature of the parol lease made and the facts and circumstances here adverted to make O'Brien's holding amount to a tenancy from year to year. It cannot be more than that, for lack of a deed or will creating it. "The implied tenancy, from year to year, will arise when the occupation is under a parol demise for years void because within the statute of frauds." Taylor, Land & Ten., Sec. 56; *Brant v. Vincent*, 100 Mich. 426; *People v. Rickert*, 8 Crow. (N. Y.) 226; *Jackson v. Bryan*, 1 Johns. (N. Y.) 322. Considered as one for more than five years, the lease was absolutely void, but, since the lessee took possession under it and paid the rent (royalty) for many years, he became a tenant from year to year.

To the argument that O'Brien having become an agent in succession to Shattuck, by his purchase of the latter's interest, could not lease to himself, it suffices to respond that, to sustain his tenancy, he need not have done so. Vrooman, Leach and Moss had authority to lease their own and the Gale interests to him, and, as to his own, he required no lease. A tenant in common may take a valid lease of his cotenant's interest. *Evans v. English*, 61 Ala. 416; *Chapin*

v. *Foss,* 75 Ill. 280; *Barghman* v. *Portman,* 14 S. W. (Ky.)
342; *Rives* v. *Nesmith,* 64 Miss. 807; 24 Cyc. 887.

This agreement, valid and binding to the extent named,
has never been terminated. O'Brien held on from year to
year, until he died and his administratrix and heirs have
succeeded him. Neither his death nor that of his landlords
terminated his tenancy. It is assignable and demisable and
may be mortgaged and pleaded as a term. Taylor, Land &
Ten., sec. 58, citing numerous authorities amply sustaining
the text. It cannot be terminated against the will of the
tenant, until after service of the statutory notice of inten-
tion to terminate. Code, ch. 93, sec. 5; *Coffman* v. *Sammons,*
76 W. Va. 13; *Arbenz* v. *Exley, Watkins & Co.,* 52 W.
Va. 476.

As to the oil royalties, there is no right to an accounting,
unless something has been wrongfully withheld from them in
the form of a salary paid to Dennis O'Brien out of the
gross royalty income, from Nov. 1877, until the end of the
year 1909, ranging from $600.00 per year to $900.00. This
allowance to him as manager began about three years before
he became a part owner, and was continued long afterward
by Vrooman, Leach and Moss. As he enlarged his interests,
he bore larger proportions of this expense himself. Owning
at least half of the property after 1901, he paid half of it
himself, and the Stephenson and Loomis estates paid part of
the residue. This charge has not only the sanction of a con-
tract authoritively made, but also the vindication of reason-
ableness. Besides, there is no attempt to impeach it on
any ground, except the technical one already disposed of.
The small coal royalties have been accounted for also. There
is no proof of any proper charge on account of timber. Such
as was used in the operations on the property was presumpt-
ively included in the contract. It was contributed by Leach,
Vrooman, Moss and the Stephenson and Loomis estates, as
well as the Gale estate, for many years, without question.
There is no clear and definite proof that any was used off
of the premises or sold, except a small amount Mrs. O'Brien
was cutting when the evidence was taken. This was scrap
lumber with some additions to fill the bill and make it mar-

ketable. There is no proof that it will not be accounted for. The bookkeeper swears the receipts of the Wood County Petroleum Co., include oil and coal royalties and rents. The correctness of its books is not impeached in any way.

Nor was there any right to have a receiver appointed, or an injunction awarded. The O'Brien tenancy has not been terminated, wherefore the O'Briens still have right of possession. Whether it can be terminated, there is no occasion now to inquire.

As neither the bill nor the amended bill contains any specific prayer for partition of the land, the assignment of error predicated on lack of provision therefor in the decree is not well founded. Upon the pleadings and evidence in the cause, there may be right to have partition to some extent or a sale of the property. As to this, we express no opinion. Nor is it necessary further to define the rights of the parties to this litigation. Many of the numerous questions discussed, but not herein disposed of, may be rendered immaterial by the action of the parties or the courts below.

The decree entered in this case, March 28, 1918, will be reversed, those entered March 19, 1914 and April 6, 1917, affirmed, and the cause remanded for such relief, not inconsistent with the conclusions here stated, as any of the parties may be able to establish title to.

*Reversed in part. Affirmed in part. Remanded.*