HEMLOCK HOLLOW COAL & COKE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8837. Promulgated March 6, 1928.

*John Enrietto, Esq.,* and *R. S. Doyle, Esq.,* for the petitioner.
*M. E. McDowell, Esq.,* for the respondent.

OPINION.

TRAMMELL: The issues presented are: (1) Whether the invested capital of petitioner for the fiscal years ended June 30, 1920, and June 30, 1921, should be increased by a paid-in surplus arising through the acquisition by petitioner of Lease No. 1; (2) whether invested capital should be increased for the years in question by a paid-in surplus arising through the acquisition of Lease No. 2; (3) whether the reduction in the amount of current earnings available for dividends in each of said fiscal years by a tentative income and profits tax theoretically set aside out of such earnings pro rata over each year is a proper reduction in the determination of petitioner's invested capital.

We must decide the last issue adversely to the respondent upon the authority of many previous decisions of the Board. *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135; *Alling & Cory v. Commissioner*, 7 B. T. A. 574; *Belmont Iron Works v. Commissioner*, 6 B. T. A. 722; *Edward Malley Co. v. Commissioner*, 6 B. T. A. 462; *Pittsburgh Valve Foundry & Construction Co. v. Commissioner*, 6 B. T. A. 460; *All America Cables v. Commissioner*, 10 B. T. A. 213.

With respect to the question as to whether the petitioner is entitled to paid-in surplus arising through the acquisition of Lease No. 1, it is well established that if the lease paid in for stock had a value in excess of the par value of the stock issued therefor, the excess constitutes paid-in surplus and may be included in invested capital. In order, however, that there may be a paid-in surplus, the actual cash value of such property must be shown to have been " clearly and substantially " in excess of the par value of the stock.

Section 326 (a) (2) of the Revenue Acts of 1918 and 1921 provides as follows:

That as used in this title the term " invested capital " for any year means (except as provided in subdivisions (b) and (c) of this section) :

\* \* \* \* \* \* \*

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus.

The fact that Huntzinger did not pay a lump sum or bonus in acquiring the lease does not prevent the inclusion in invested capital of the actual cash value thereof at the time of its acquisition by the petitioner. The real question is did the lease have an actual value at the time Huntzinger turned it over to the corporation for stock in excess of the royalty or other payments required to be made to the lessor, and in excess of the par value of the stock issued therefor.

The evidence is that Lease No. 1 provided for a 10 cent royalty rate and that this was the prevailing rate in that vicinity. There is evidence that one lease in that vicinity provided for a rate as low as 6 cents a ton. The territory in which this land was situated was developed coal land. Other leases were being successfully operated near-by when Huntzinger acquired the lease from the lessors. Both Huntzinger and the lessors were familiar with these facts and with the regular and usual royalty rate in that vicinity. The lessors and lessees appear, from all the facts, to have arrived at the royalty rate to be paid upon a consideration of what other leases had been made for and of the prevailing rate of royalty in that vicinity. There is nothing to indicate that any favor was given or received by Huntzinger in acquiring the lease, or that the lessees and lessors were not dealing at arm's length. This lease was acquired by Huntzinger in September, 1901, and turned over to a corporation which was organized to take it over, the organization of which was completed in December, 1901, when the transfer to it was made. While the lease cost Huntzinger nothing, he turned it over to the corporation for 25 per cent of its stock, receiving in the aggregate $12,500 par value of stock.

We think that these circumstances, indicating dealings between a willing lessor and a willing lessee at arm's length, having knowledge of all the circumstances and a knowledge of the prevailing rate of royalty in that immediate vicinity, and the fact that the lessor had made numerous leases to others upon substantially the same terms and conditions as were included in this lease, have greater weight in determining the actual cash value of the leasehold than the facts and circumstances relied upon by the petitioner. The facts relied upon by the petitioner occurred in 1903 and subsequent years. In 1903, when the stock was sold at $160 per share, the development work had been completed, some coal had already been sold and other conditions had occurred. The petitioner also relied, to some extent, upon the amount of dividends paid from 1908 to 1918, and the net operating profits from 1907 to 1916, which, to our mind, have substantially no weight in showing the value of the leasehold in 1901. It is to be observed that while witnesses testified who, on account of their long experience in the

coal business in this vicinity and the making and securing of leases, would have been competent to testify as to the value of the leasehold in 1901 when acquired by the corporation, no such testimony was elicited from them.

There was some evidence introduced with respect to a branch line of railroad, the construction of which began some time in 1901. There is no testimony, however, that this railroad was begun after Huntzinger acquired the lease and before it was transferred to the corporation, nor are we convinced by the testimony that Lease No. 1 had any greater value at the time it was transferred to the corporation than when Huntzinger acquired it without any outlay.

For the foregoing reasons it is our opinion that the petitioner is not entitled to any paid-in surplus with respect to Lease No. 1.

With respect to Lease No. 2, it appears that the petitioner acquired this lease direct from the lessor without any consideration other than payment of the required royalties therein provided. It is true that the lessors felt under obligation to make a lease to Guthrie on account of the fact that their father had promised to make such a lease during his lifetime. Guthrie, however, did not have, and did not claim to have, any legal claim to the leasehold from the Beury heirs, or from Beury, and when the lease was made in 1903, it was made upon substantially the same terms and conditions and with the prevailing rate of royalty in that vicinity. It was based upon the same terms and conditions as were contained in Lease No. 1. Guthrie had no right, title or interest to assign to the corporation with respect to Lease No. 2, and, since the lease was made direct to the corporation without any consideration other than the royalty payments which were required, no basis is afforded for a paid-in surplus. The Beury heirs had no connection with or interest in the corporation and made the ordinary and usual lease upon the usual terms and conditions as they had made with others on some of the coal lands in that vicinity.

There were approximately 178.80 acres of this land included in Lease No. 2 in which a partner of J. L. Beury owned an undivided one-half interest. The Beury heirs, in making Lease No. 2, leased all of the land which they owned absolutely, and included the 178.80 acres in which they only owned a one-half interest. William Beury, however, verbally authorized the manager of the petitioner corporation to enter upon and mine the coal from the land in which he owned a one-half interest and that he, William Beury, would later execute a lease. In 1904 the petitioner began to remove coal from this acreage, and without objection from any one continued to mine it as if it had been held under a formal lease and paid royalties on the coal mined.

The petitioner cites the case of *Drake* v. *O'Brien* 83 W. Va. 678; 99 S. E. 280, as authority for the proposition that the verbal lease, under the circumstances, was valid and binding. In the case cited, however, the lessee took actual possession and paid the royalties for many years. One of the owners treated him as a tenant for seven years, another for eight years, and another for eleven years. But here, in 1903, the date when Lease No. 2 is sought to be included as paid-in surplus, the petitioner had not entered into possession of the property, had mined no coal and paid no royalties with respect to which the owner of the one-half interest had authorized verbally the petitioner corporation to mine.

The statutes of West Virginia, with respect to the verbal leasehold, are as follows:

Code, ch. 71, sec. 1. No estate of inheritance or freehold, or for a term of more than five years, in lands, shall be conveyed, unless by deed or will; * * *

Code, ch. 98, sec. 1. No action shall be brought in any of the following cases: * * *

(6) Upon any conract for the sale of real estate, or the lease thereof, for more than a year.

In the case of an oral lease, the principles laid down by the Court of Appeals of West Virginia in the case of *Drake* v. *O'Brien, supra,* have no application, because at the time in question the petitioner had received no cash and had acquired no right of property by having taken possession as was the situation in that case. On the other hand, if the petitioner did acquire a property right, it acquired it, not from Guthrie, but from the lessor direct, without any money or other consideration except the royalties required to be paid.

Under the foregoing circumstances, the statute does not authorize the inclusion of a paid-in surplus.

> *Judgment will be entered on 15 days' notice, under Rule 50.*